# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4040 | **DATE** | 8/28/2001 |
| **CASE TITLE** | Zapata Hermanos Sucesores, S.A. Vs. Hearthside Baking Co., Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. More than one line of analysis confirms Lenell's obligation to bear Zapata's attorneys' fees, so that Zapata may be made whole for the damages and expenses it has been forced to bear due to Lenell's misconduct. As stated earlier, with the next step being the quantification of that amount, this action is set for a next status hearing at 9 a.m. September 5, 2001.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | AUG 29 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 AUG 28 PM 3:20 | 8/28/2001 date mailed notice | |
| SN | courtroom deputy's initials | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
AUG 29 2001

ZAPATA HERMANOS SUCESORES, S.A., )
                                 )
                Plaintiff,       )
                                 )
        v.                       )   No. 99 C 4040
                                 )
HEARTHSIDE BAKING CO., INC.,     )
etc.,                            )
                                 )
                Defendant.       )

MEMORANDUM OPINION AND ORDER

After having prevailed in principal part before the jury that heard the litigants' major commercial dispute, Zapata Hermanos Sucesores, S.A. ("Zapata") has moved for an award of attorneys' fees on three alternative grounds, two of them advanced against defendant Hearthside Baking Co., Inc., d/b/a Maurice Lenell Cooky Co. ("Lenell") and the third advanced against Lenell's litigation counsel, Gordon & Centracchio, L.L.C. ("Law Firm"). This Court's August 22, 2001 memorandum opinion and order dealt with Zapata's motion against the Law Firm. Now the issues as between Zapata and Lenell have become fully briefed, and this memorandum opinion and order resolves that claim in favor of Zapata and against Lenell.

In an unsuccessful effort to "make the worse appear the better reason,"[1] Lenell's counsel lay heavy stress on the facts that Zapata has sued Lenell in a United States court and that the

---

[1] John Milton, Paradise Lost, bk. II, ll. 113-14, likely drawn from Diogenes Laertius, Socrates 5.



well-known "American Rule" calls for litigants to bear their own legal expense. But in so doing, Lenell's counsel present their arguments in a way that impermissibly seeks to draw attention away from an exception that is built into the American Rule itself[2]--an exception that their Mem. 2 itself quotes from <u>F.D. Rich Co. v. United States f/u/o Industrial Lumber Co.</u>, 417 U.S. 116, 126 (1974) (internal quotation marks and citation omitted, but with appropriate emphasis added):

> The so-called "American Rule" governing the award of attorneys' fees in litigation in the federal courts is that attorneys' fees are not ordinarily recoverable <u>in the absence of a statute or enforceable contract providing therefor</u>.

Accord, such cases as <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 257 (1975).

There is a reason of course that the doctrine on which Lenell seeks to rely is called the American Rule: This country is in the minority of commercial jurisdictions that do <u>not</u> make prevailing parties truly whole by saddling their adversaries with the winners' legal expenses--an omission that does not (as does the vast majority of other jurisdictions' fee-shifting approach) put the winners in contract disputes into the same economic position as if the breaching parties had performed their required

---

[2] As this opinion explains, that sleight-of-hand effort--better suited to a shell game along the midway of a state fair than to a legal memorandum--serves to obscure the true simplicity of the current inquiry

2

obligations under the contracts (see John Gotanda, <u>Awarding Costs and Attorneys' Fees in International Commercial Arbitrations</u>, 21 <u>Mich. J. Int'l Law</u> 1, 6-7 & nn. 20, 27 (1999)(reviewing identical principles applicable to litigation as well as arbitration); John Gotanda, <u>Supplemental Damages in Private International Law</u> 146-73 (1998)(confirming those principles applicable in litigation)). In this instance two stipulations in which Lenell has joined bury its efforts to escape liability via the American Rule:

1. Both sides have agreed all along that their claims and counterclaims are governed by a treaty to which the United States is a signatory, the Convention on the International Sale of Goods ("Convention"). And here is the controlling provision of Convention Art. 74 ("Article 74") (emphasis added):

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party <u>as a consequence of the breach</u>. Such damages may not exceed the loss which the party in breach <u>foresaw or ought to have foreseen</u> at the time of the conclusion of the contract, in light of the facts and matters of which he then knew or ought to have known, <u>as a possible consequence of the breach of contract</u>.

2. Before trial the litigants entered into a June 8, 2001 Stipulation that provided in relevant part (again with emphasis added):

> 1. As of the dates when Lenell issued its purchase orders for the tins described in the invoices attached as Group Exhibit A to Zapata's

3

> Complaint in this case, <u>Lenell foresaw or should have foreseen that if Lenell failed to pay for the tins that it ordered, received and accepted, Zapata would incur litigation costs including attorneys fees, to seek payment of the invoices for said tins</u>.
>
> 2. The Court shall determine if attorney's fees are recoverable as a matter of law.
>
> 3. The amount of litigation costs, including attorneys' fees, to be assessed as consequential damages in this case, if any, will be for the Court to determine on a fee petition, rather than for the jury to decide.

There is no room to question the source of law to which this Court is to look to make the determination called for by the last-quoted Stipulation. With the Convention--a treaty--controlling the relationship between Mexican seller Zapata and United States purchaser Lenell, this Court has been called upon to exercise subject matter jurisdiction over Zapata's successful substantive claim in federal question terms. That of course calls into play federal choice-of-law principles rather than those of any state such as Illinois (see, e.g., <u>RTC v. Chapman</u>, 29 F.3d 1120, 1124 (7th Cir. 1994), citing the seminal decision in <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 318 U.S. 487 (1941)). And relatedly, before trial Zapata dropped its alternative state law account-stated claim, which could perhaps have called diversity or supplemental jurisdiction (and thus local choice-of-law principles) into play as to that claim.

In that respect the existence or nonexistence of a fee-

4

shifting rule is one of substantive policy (Alyeska Pipeline, 421 U.S. at 259 n.31; contrast Midwest Grain Prods. of Ill., Inc. v. Productization, Inc., 228 F.3d 784, 787 (7th Cir. 2000), a diversity case on which Lenell unpersuasively seeks to rely). And a treaty, occupying international scope as it does and (as in this case) defining the relationships between nationals of different signatory countries, calls for uniformity of construction. Although written about a different provision of the Convention, the analysis in MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova D'Agostino, S.F.A., 144 F.3d 1384, 1391 (11th Cir. 1998) applies with equal force to mandate universality rather than a purely home-town rule as to the awardability of attorneys' fees under the Convention:

> One of the primary factors motivating the negotiation and adoption of the CISG was to provide parties to international contracts for the sale of goods with some degree of certainty as to the principles of law that would govern potential disputes and remove the previous doubt regarding which party's legal system might otherwise apply. See Letter of Transmittal from Ronald Reagan, President of the United States, to the United States Senate, reprinted at 15 U.S.C. app. 70, 71 (1997). Courts applying the CISG cannot, therefore, upset the parties' reliance on the Convention by substituting familiar principles of domestic law when the Convention requires a different result. We may only achieve the directives of good faith and uniformity in contracts under the CISG by interpreting and applying the plain language of article 8(3) as written and obeying its directive to consider this type of parol evidence.

It is therefore wholly misleading for Lenell to contend as it does for the parochial application of the American Rule (as by

5

attempting to call <u>Midwest Grain</u> to its aid). Although the norm in our own judicial system is for each litigant in a purely United-States-based dispute to bear the burden of its own legal expense, that does not at all equate to the notion that public policy (or anything else) forbids a federal court's judicial enforcement of a different rule that is appropriately brought into play--indeed, the earlier-quoted language from <u>F.D. Rich</u> expressly contemplates such enforcement where there is a statute (and a treaty calls for an a fortiori application of that notion) that instead establishes a "loser pays" regime.

It surely cannot be said that Zapata opted for the application of Illinois substantive law (or for the American Rule as such) just by having sued Lenell in a jurisdiction that did not pose serious problems of the nature that would have been generated by an attempt to sue at Zapata's own home base in Mexico--that is, by selecting a forum where Lenell could not assert any otherwise available challenge to in personam jurisdiction and where a favorable judgment for Zapata would be directly enforceable and capable of execution. And when purely parochial considerations are put aside (quite properly so), it cannot be gainsaid that the normal unstrained reading of Article 74 coupled with the above-quoted Stipulation calls for Zapata's recovery of its attorneys' fees as foreseen consequential damages.

6

When the searchlight of analysis is thus properly focused on the language of the Convention without any inappropriate overlay from the American Rule, the question becomes a simple one. As n.2 has said, it truly smacks of a shell game for Lenell to have entered into the commitments to which it has stipulated and yet to urge that Zapata's admittedly foreseeable legal expense ("which the party in breach [Lenell] foresaw or ought to have foreseen," in the language of Article 74) was not "suffered by the other party [Zapata] as a consequence of the breach" (again the language of Article 74). It is totally unpersuasive for Lenell's counsel to contend instead that those commitments and Lenell's admissions do not equate to saying that attorneys' fees are "consequential damages" recoverable under the Convention.[3]

That distorted reading of the language is clearly refuted by the decisions cited at Zapata Mem. 4 from other countries' courts

---

[3] As hackneyed as the reference has become, it is hard to resist repeating the familiar quotation from Lewis Carroll's <u>Alice Through the Looking-Glass</u> ch. 6:

> "When <u>I</u> use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean--neither more nor less."
>
> "The question is," said Alice, "whether you <u>can</u> make words mean so many different things."
>
> "The question is," said Humpty Dumpty, "which is to be master--that's all."

For the reasons explained here, Lenell and its counsel will not be permitted to emulate Humpty Dumpty--except of course for their sharing the ultimate fate of having a great fall.

7

and arbitral tribunals. Obviously unable to counter directly, Lenell attempts to draw an inference from cases that decide the applicable <u>interest rate</u> under the Convention--not the right to the <u>payment of interest</u>, which the Convention admittedly calls for--under local law. But that effort to equate those issues really misses its mark, for the following explanation demonstrates that such interest-rate-related rulings really support Zapata's position rather than Lenell's.

Look at the situation of the injured seller of goods and what is required to make it whole. There is of course no near-universal rate of interest on unpaid obligations, and the drafters of the Convention took note of the fact that some sellers injured by nonpayment for their goods would be made whole by applying the interest rates at their homes, while others would need prejudgment interest to be paid at the rate applicable at their buyers' locales to provide full relief (see Peter Schlechtriem, <u>Uniform Sales Law--The UN-Convention on Contracts for the International Sale of Goods</u> 98-99 (Manz, Vienna 1986). For that reason the Convention's drafters called for the payment of prejudgment interest (which every unpaid seller needs for full recovery), but compromised by leaving the interest rate open for decision on a case-by-case basis (<u>id</u>.)--so that the injured seller's make-whole expectations are met by compensating it for its own cost of delayed payment as well as recovering the payment

itself.

Now look at the situation of the same injured seller in terms of the other component of being made whole. Exactly as with prejudgment interest, that result is assured <u>only</u> by freeing its damages recovery from the burden of attorneys' fees. Little wonder, then, that the award of such fees is nearly universal among commercial nations (see the two Gotanda publications cited earlier). And surely in this instance, the make-whole expectations of the injured seller--a Mexican company--are best met by conforming to Mexico's own adherence to that nearly universal rule.

In sum, the award of attorneys' fees has really been agreed to, although Lenell does not now acknowledge it,[4] by the

---

[4] Lenell has studiously sought to avoid the fact that its own Amended Counterclaim filed January 3, 2000 (comprising a whole set of claims arising out of asserted late deliveries and other alleged nonperformance by Zapata) sought not only compensatory damages of some $225,000 but also, as part of its requested judgment on that counterclaim (emphasis added):

> In favor of Lenell and against Envases, awarding Lenell its interest, costs, disbursements, consequential damages, <u>attorneys fees</u> and other and further relief as this Court deems just and proper.

But now that the shoe is on the other foot, Lenell's position has mysteriously become that the attorneys' fees that <u>it</u> specifically sought under the Convention are somehow nonrecoverable by Zapata because of the American Rule. Leaving aside the level of hypocrisy (or perhaps even estoppel or "mend the hold" principles) raised by Lenell's stance, it need scarcely be added that whether under the Convention or otherwise, the case for attorneys' fees sought by a prevailing party from Mexico (where local law awards them) necessarily has to be stronger, if

9

combination of Lenell's stipulation and Article 74. Because the amount of the fee award remains to be resolved, a status hearing is set for 9 a.m. September 5, 2001, to discuss the procedure and timing for that purpose.

Although what has been said to this point is dispositive of the issue, it is worth looking at Zapata's other string to its bow: its invocation of the inherent-power predicate for imposing a litigant's fees on its adversary where the adversary has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" (F.D. Rich, 417 U.S. at 429) in its prelitigation or litigation conduct or both. Although Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) has become the most recent definitive case in that respect, the Supreme Court had earlier confirmed that teaching in such cases as Hall v. Cole, 412 U.S. 1, 15 (1973), reconfirmed in Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980); Alyeska Pipeline, 421 U.S. at 258-59; and Hutto v. Finney, 437 U.S. 678, 689 n.14 (1978).[5]

---

anything, than a like claim by an Illinois party (where local law does not).

[5] This opinion has used the term "teaching" advisedly, for Lenell's counsel--unable in any other way to blunt the force of what the Supreme Court has opined--has retreated to the fallback position of seeking to "distinguish" those cases because each of them involved a differing factual scenario. But it is a truism that every case is "distinguishable" from every other case in that limited sense. What is significant instead is that the Supreme Court has repeatedly and expressly stated the scope of the inherent power doctrine in the terms described in the text here--and this opinion is directly faithful to that unambiguous

10

This Court has already spoken and written at some length about the bad faith with which Lenell and its people conducted their dealings with Zapata and then, when they ceased to do business with Zapata and the latter was forced to sue to collect for the unpaid sale price of its tins, with which they conducted this litigation. Instead of repeating that discussion, this opinion attaches Zapata Mem. 2-3, which provides an encapsuled and accurate description of Lenell's activity. That conduct by Lenell both leading up to and during the litigation supports an award of attorneys' fees pursuant to the inherent power doctrine under the cited Supreme Court decisions and such other cases as United States v. Fidelity & Deposit Co., 986 F.2d 1110, 1120 (7th Cir. 1993).[6]

---

teaching.

[6] Because Lenell's late-advanced artwork counterclaim is pending before one of this Court's colleagues, this opinion has carefully steered clear of any substantive comments on that score. But this Court cannot help but remark that when Lenell and its counsel took a second look at Lenell's potential offensive position at the very beginning of the year 2000 (this action had been filed by Zapata in June 1999, Lenell filed its Answer and Counterclaim in August 1999 and then Lenell's Amended Counterclaim was submitted on January 3, 2000), that Amended Counterclaim catalogued no fewer than eight separate alleged breaches by Zapata that added up to the $225,000-plus counterclaim figure. Yet that second look, which was obviously the consequence of a fine-tooth-combing of the entire Zapata-Lenell relationship, contained not a whisper as to any alleged counterclaim for the nonreturn of artwork belonging to Lenell. There is no question that Lenell was both then and earlier in possession of every fact regarding that relationship (which had terminated nearly a year earlier)--Lenell's own key witnesses so testified during the trial. Yet it was not until later, when the

11

## Conclusion

More than one line of analysis confirms Lenell's obligation to bear Zapata's attorneys' fees, so that Zapata may be made whole for the damages and expenses it has been forced to bear due to Lenell's misconduct. As stated earlier, with the next step being the quantification of that amount, this action is set for a next status hearing at 9 a.m. September 5, 2001.

                             _____
                             Milton I. Shadur
                             Senior United States District Judge

Date: August 28, 2001

---

case called for the preparation of the final pretrial order (the prelude to trial), that the supposed artwork claim miraculously sprang to life in the form of still another proposed amendment to Lenell's counterclaim. And of course no plausible argument could be advanced that anything in the discovery process was needed to learn the existence of such a claim--as just stated, all of the underlying facts were already in Lenell's own possession. Although the as-yet-unresolved artwork issue has not formed part of the matrix for decision here, Lenell's attempt to delay the day of reckoning by the belated injection of that added claim surely seems suspect.

bad faith refusal to pay *anything* for the hundreds of thousands of tins that it received and used years ago, and its continuing course of misconduct throughout this litigation in denying any liability to Zapata, thereby dramatically and needlessly expanding the scope of this litigation to cover invoices for which Lenell had absolutely no defense against payment as a matter of law.

Under domestic law, this Court possesses the inherent power to award attorneys' fees and expenses where such fees and expenses are incurred as a result of bad faith conduct. *Chambers v. NASCO*, 501 U.S. 32, 45–46, 111 S. Ct. 2123, 2133 (1991). It is difficult to imagine a clearer case of bad faith than this one. Indeed, Terry Cohen admitted on the witness stand that on March 10, 1999, in response to Zapata's decision not to ship any more tins to Lenell until Lenell paid its past due balance in full, he threatened Zapata that as a former supplier, Zapata would no longer have any priority for payment. That testimony speaks volumes of Lenell's true motivation. As Mike Gibson and Dennis Headley both testified, Terry Cohen told Zapata in no uncertain terms that if Zapata stopped shipping any more tins to Lenell, Zapata would never get paid – and, in fact, that is exactly what happened. Since that date more than two years ago, Lenell has refused to pay Zapata even a *dime* for any of the 1.6 million tins that Lenell kept and used even though Lenell's own records showed it owed Zapata hundreds of thousands of dollars for the tins. Lenell thus carried out its threat as retribution for Zapata's audacious decision not to ship any more tins until Lenell paid for the tins it had already received.

To make matters even worse, Lenell decided to make it as difficult and expensive as possible for Zapata to recover its money in this litigation. Despite its own accounting records, and the fact that Lenell had absolutely no defense to payment of invoices totaling $857,796.90, Lenell answered the complaint by generally denying that Lenell "breached its contractual obligations" and by specifically denying that Lenell was "liable for *any* damages for any alleged breach." Answer, ¶ 2 (emphasis added) (attached hereto as Ex. 2). Lenell never amended this answer. Through its general denial,

Lenell dramatically expanded the scope of this litigation, including discovery and the trial, by forcing Zapata to undertake the difficult and time-consuming task of proving its entitlement to payment for more than 100 invoices that Lenell knew full well it was obligated to pay.

Lenell's general denials also could not have been the product of any mistake, or any claim that it lacked sufficient information to confirm its obligation to pay Zapata's uncontested invoices. At the very outset of this litigation, Lenell answered Zapata's requests for admission, and admitted to receiving, accepting and using virtually all of the tins that have been the subject of this litigation, thereby establishing the very facts that, after a lengthy and needless trial, entitled Zapata to judgment as a matter of law with respect to those invoices.

In the simplest terms, this is a case of an extreme bad faith refusal to pay, both before and during this litigation, and which continued through the trial itself. Accordingly, Zapata is entitled to recover its attorneys' fees not only as an element of consequential loss under the Convention, but under the Court's inherent power to award attorneys' fees in cases of bad faith; and pursuant to 28 U.S.C. § 1927.

## ARGUMENT

I. ATTORNEYS' FEES ARE RECOVERABLE UNDER THE CONVENTION WHERE THEY ARE FORESEEABLE CONSEQUENTIAL DAMAGES TO A BREACH OF THE PARTIES' AGREEMENT.

The Convention provides that all foreseeable damages incurred "as a consequence of [a] breach" are recoverable:

> Damages for breach of contract by one party consist of *a sum equal to the loss*, including loss of profit, *suffered by the other party as a consequence of the breach*. Such damages may not exceed the loss which the party in breach *foresaw or ought to have foreseen* at the time of the conclusion of the contract, in light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

Convention, Art. 74 (emphasis added).