# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4040 | **DATE** | 3/13/2002 |
| **CASE TITLE** | Zapata Hermanos Sucesores vs. Hearthside Baking Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Zapta's motion is granted in its entirety. (100-1) Its Fee Ex.6 has calculated compound interest through various dates, and the one applicable to this opinion (projecting one more day for docketing) calls for $43,357.64 in compound interest in addition to the principal sum of $441,708.69, or a total of $485,066.33. Judgment is therefore ordered to be entered in favor of Zapata and against Lenell in the aggregate sum of $485,066.33.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | MAR 14 2002 | |
| | Notified counsel by telephone. | | | date docketed | 117 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 3/13/2002 | |
| | | | | date mailed notice | |
| SN | courtroom deputy's initials | | Date/time received in central Clerk's Office | SN mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ZAPATA HERMANOS SUCESORES, S.A., )
)
        Plaintiff, )
)
v. ) No. 99 C 4040
)
HEARTHSIDE BAKING CO., INC., )
etc., )
)
        Defendant. )

**DOCKETED**

**MAR 1 4 2002**

MEMORANDUM OPINION AND ORDER

    Since the issuance of this Court's February 12, 2002 memorandum opinion and order ("Opinion") dealing with one aspect of the award to Zapata Hermanos Sucesores, S.A. ("Zapata") of certain attorneys' fees and expenses that it has paid and incurred in connection with its completed litigation against Hearthside Baking Co., Inc. d/b/a Maurice Lenell Cooky Co. ("Lenell"), the parties have completed their evidentiary presentations on that subject. At this point the matter is ripe for disposition.

    To a greater extent than was the case as to the underlying merits of the litigation (in which a very minor part of Lenell's opposition to Zapata's claim proved to be viable), Lenell has come up empty--in this instance, totally empty--on the issue of fees and expenses. Just as Lenell succeeded in dragging out what should have been a relatively simple collection case for goods sold and delivered by interposing a host of unwarranted roadblocks that unjustifiably converted the litigation into an

enormously time-consuming and expensive lawsuit, so its efforts to attack the fee request by Mayer Brown & Platt (now Mayer Brown Rowe & Maw, but referred to here for convenience simply as "Mayer Brown") has done nothing more than to roil the waters without impeaching that request in any respect whatever.

To begin with, Lenell's purported expert--a lawyer of some 25 years' standing, on whose opinions Lenell seeks to bottom the bulk (though not all) of its opposition--appears from his resume to be an experienced litigator. But as his Fed. R. Civ. P. ("Rule") 26(a)(2)(B) report and his hearing testimony have made abundantly clear, and as this opinion will explain in some detail, he has shown himself to be entirely unqualified to render a credible opinion on the issues posed by this case. Whether or not he might have placed himself in a position to do so by striving to build on his existing foundation as a practitioner, through the extensive amount of further analysis, further research and further work that would have been required to that end is a moot issue--for what controls instead is that he did not engage in that major building project.[1] And as for Lenell's

---

[1] For that reason this opinion will consistently place the word "expert" in quotation marks. Without that cautionary usage--because to label someone unqualifiedly as an "expert" tends to lend credence to whatever that person has said--the attribution of that presumed badge of credibility might have blunted the force of the criticisms voiced here. As is demonstrated in spades in this opinion, there is no way in which the opinions voiced by Lenell's witness can be characterized as exhibiting any quality of expertise in terms of the situation

2

lawyer handling the fee litigation itself,[2] he frittered away his, opposing counsel's and this Court's time in attempted challenges that also cannot survive any reasoned scrutiny.

To return to Lenell's claimed "expert," some idea of the real absurdity of his opinions may be gleaned from his repeated emphasis that this was a collection case--a simple case of goods sold and delivered--so that the hourly rates charged by Mayer Brown were assertedly excessive. As the "expert" said at the outset of his statement in that respect in his Rule 26(a)(2)(B) report:

> This case did not involve a technical or novel area of law, but was a collection case for monies owed for goods supplied.

And given that skewed view (more of this later), what did the "expert" tender as assertedly comparable litigation? Two lawsuits that his law firm had brought in the Municipal Department of the Circuit Court of Cook County on behalf of Ameritech against lessees that were in default under equipment leases, one of those lawsuits asserting damages of less than $3,000 and the other claiming damages of less than $4,000. Total attorneys' fees sought in each case were $1,000, at an hourly rate of $160. For the claimed "expert" to suggest that those

---

presented by this case.

[2] This is framed in the singular because, although a second lawyer also filed an appearance on Lenell's behalf, he really played no active role in the fee proceeding.

3

lawsuits could be the source of probative evidence as to this case--a case involving a claim of some $1.3 million for a very large number of deliveries of cookie tins, hopelessly complicated as the case was made by Lenell by creating the need to investigate, prepare for and successfully oppose Lenell's late-advanced, convoluted, multifarious and (regrettably) baseless defenses and counterclaims, might have been thought of as a bad joke had it not been for the "expert's" having advanced his argument with a straight face.[3]

That same oversimplistic (and insupportable) approach marked what the "expert" labeled as his "survey" of relevant market hourly rates in the Chicago area. First, to characterize what

---

[3] To obtain a further demonstration of why no legitimate claimant to the mantle of an expert could characterize the underlying litigation here as a simple and straightforward collection matter (or as a simple breach of contract lawsuit), one need only review the trial transcript, as well as the series of opinions that this Court was called upon to render to resolve a host of hotly-disputed aspects of the case--e.g., this Court's December 8, 2000 opinion ruling on the parties' respective motions in limine; its lengthy July 18, 2001 opinion and judgment order rejecting, as to all but two minor adjustments, Lenell's post-verdict Rule 50 and Rule 59 motion ("all of it of the type that attempts to fling gobs of mud toward a wall or ceiling, hoping that as much as possible will stick"); its brief July 19 opinion rejecting still another Lenell "dog-in-the-manger approach" in the form of a second Rule 59 motion; its August 22 opinion (155 F.Supp.2d 969) holding Lenell's counsel liable for Zapata's incremental lawyers' fees attributable to the Lenell lawyers' violation of 28 U.S.C. §1927; and its August 28 opinion holding Lenell itself liable for the fees that are ultimately dealt with in this opinion, a liability supported both by the Convention on the International Sale of Goods and, secondarily and alternatively, by application of the inherent power doctrine.

4

was done as a survey at all is wholly at odds with the methodology required of any valid survey. All that the "expert" did was to self-select a small sample of a handful of small law firms (about a dozen in number) that he knew to be involved in the handling of such collection cases as he mischaracterized this litigation to have been.[4] Even apart from that wholly unscientific approach to the conduct of any survey properly understood, the effort was doomed to failure because it proceeded from the "expert's" commitment to a totally false premise about the nature of the litigation. In the computer field such efforts, proceeding from a mistaken assumption to a necessarily mistaken conclusion, long ago earned the sobriquet "GIGO": "Garbage in, garbage out."

It would be possible to dissect the "expert's" opinions on the subject of the appropriate hourly rates strand by strand, repeatedly exposing the groundlessness of those opinions, but it is scarcely necessary to do so. Perhaps the most graphic demonstration of what has to be viewed as a worthless opinion on the subject came in the witness' response to the final question

---

[4] That process was further skewed by the "expert's" additionally mistaken perception that what was called for here was equivalent to obtaining Bankruptcy Court approval of a claim for fees based on the known need for such approval from the outset, as contrasted with the substantively different situation explained and discussed in the Opinion and the precedents relied upon there. Indeed, all too much of the "expert's" direct testimony was taken up with that nonanalogous subject.

5

posed to him during his examination on the stand, one posed by this Court: When asked whether he was even <u>aware</u> of the two critically important decisions by our Court of Appeals that were cited and quoted in Opinion at 4-6 (the <u>Balcor</u> and <u>Medcom</u> cases), the "expert" was candid enough to say "no."[5] For anyone who holds himself out as qualified to render an opinion on fees in a case such as this one not to have done the necessary homework to learn (let alone to know in advance) about such highly relevant authorities, so that the witness might at least attempt to explain why they are not persuasive (let alone controlling) authorities here, is to confirm that witness' total <u>lack</u> of qualification.

It is also frankly unnecessary to go through the step by

---

[5] As the Opinion pointed out, those decisions conclusively show the wrongheadedness of the approach voiced in the "expert's" Rule 26(a)(2)(B) report (which was repeated at length in his testimony):

> The hourly rates charged by the plaintiff's counsel exceed the market rate in the Chicagoland area for comparable services by attorneys with equal or greater experience. The rates charged by plaintiff's counsel's firm do not accurately reflect the actual Chicagoland market rate for attorneys in the area of commercial litigation or international business litigation. The rates set by Mayer, Brown and Platt are not based upon the actual market for legal services in the Chicago area, but are arbitrarily set and raised. The rates charged for a case of this nature are excessive.

But even if the "expert's" just-stated view of the market were somehow to be accepted, his unreliable methodology referred to in the preceding paragraph of the text saps his opinions of any force.

6

step analysis marked out by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) as refined by <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999)--and as both of those seminal authorities have been reinforced by the recently revised Fed. R. Evid. ("Evid. R.") 702 and its accompanying Committee Note--to confirm the inadmissibility of opinion evidence such as that proffered by Lenell here. What has already been said really torpedoes that opinion both in terms of its utter lack of reliability (<u>Daubert</u>, 509 U.S. at 589-90) and "fit" (<u>id</u>. at 591)--in the latter respect, the opinion's total failure to fit "the particular circumstances of the particular case at issue" (<u>Kumho</u>, 526 U.S. at 150).[6] And those deficiencies in turn support the outright rejection as inadmissible of the entire aspect of the "expert's" opinion dealing with hourly rates. But even were that testimony to be found technically admissible, it is so flawed as to compel its rejection on grounds of

---

[6] As chance would have it, the writer of this opinion (who now chairs the Judicial Conference's Advisory Committee on the Rules of Evidence) was, at the time that the December 1, 2000 amendment to Evid. R. 702 and its accompanying Committee Note were in the lengthy gestation process leading to adoption, the chair of the Advisory Committee's subcommittee assigned to the project of addressing Evid. R. 701 through 703. In that capacity the writer had the primary responsibility for reviewing and for placing into their ultimate form the versions of Evid. R. 702 and the Committee Note originally drafted for Committee consideration by its outstanding reporter, Professor Dan Capra of Fordham Law School. And as a reading of the extensive Committee Note will disclose, it (like <u>Daubert</u> and <u>Kumho</u>) fully anticipated the type of unreliable and ill-fitting opinions that have been proffered here--and it too teaches the flat-out rejection of such opinions.

weightlessness. Instead the evidence squarely supports the
reasonableness of the rates that were charged by the Mayer Brown
lawyers and were then vetted and approved by Zapata's general
counsel--not only under the principles set out in <u>Balcor</u> and
<u>Medcom</u>, but independently of those decisions as well.

To shift to consideration of the reasonableness of the time
spent by the Mayer Brown attorneys in the litigation, the just-
explained total unreliability of the Lenell "expert's" opinion as
to hourly rates points to the discrediting of his views on the
subject of time expenditure as well. On that score, this is one
case that merits application of the principle "falsus in uno,
falsus in omnibus," for once again the reliability of the
"expert's" opinion as to time spent is fatally distorted by his
misperception of the underlying litigation as a straightforward
collection matter. That negates any degree of credence to be
ascribed to the "expert's" notion of what time budget should be
attributed to the case. Instead this Court finds totally
credible the testimony of Zapata's attorneys--most particularly
the thorough explanation given by Mayer Brown's Javier Rubinstein
in his rebuttal testimony--as to (1) the reasons for the use of
three lawyers in the case (with no duplication of effort being
involved) as well as to (2) the reasonableness of the numbers of
hours devoted to the litigation.

While the discussion to this point has shown how the

exposure of the opinions of Lenell's purported "expert" to the
sunlight of analysis has shriveled those opinions into
nothingness, the balance of this opinion will address how the
efforts by Lenell's hearing counsel to impugn the time charges by
the Mayer Brown lawyers were even worse--were downright bogus.
Thus, for example, the protracted interrogation by Lenell's
counsel about a claimed lack of detail reflected in the time
entries (most extensively by criticizing the entries' listing of
"trial preparation" without particularization as to the specific
tasks involved) was totally bootless as a challenge to those
entries. That bootlessness is twofold.

First, all of the Mayer Brown time entries were prepared
solely for consideration by its client Zapata, not in
contemplation of court review. This was not a situation
involving a fee-shifting statute (see the rejection of that
claimed analogy in Medcom, 200 F.3d at 520-21). Not only were
the bills prepared for Zapata's consumption alone, but its house
counsel vetted and approved all of those bills (as stressed in
Balcor, 73 F.3d at 153).

Second and just as importantly, Mayer Brown expressly
invited Lenell's counsel to pose any questions at all having to
do with providing more detailed descriptions of any time entries,
so that the Mayer Brown lawyers could then go back if necessary
to reconstruct just what particular work was being done at any

9

given time. Here is the last paragraph of the November 16, 2001 letter from Mayer Brown's Thomas Lidbury to Lenell's counsel Timothy Touhy (Zapata Fee Ex. 2):

> If you have any other questions please let me know. In particular, if any of your objections are based upon a lack of detail, or hinge in some way on additional information about an entry, please let me know. We should deal with that sort of thing before we both brief the issue.

No response whatever came back from Lenell's counsel during the ensuing months before the evidentiary hearing. For attorney Touhy now to challenge and cavil at any claimed lack of detail, as he did by repeated questioning of the Mayer Brown lawyer witnesses during the hearing, can only be viewed as the bad faith pursuit of this fee litigation.

That was equally true of the attempt by Lenell's counsel Touhy to charge Mayer Brown with the expenditure of excessive time--an effort that took the form of contrasting the recorded 234 hours of "T1" trial preparation entries (time that was spent in getting ready for an anticipated, but then postponed, February 2001 trial date) with the 336 hours of "T2" trial preparation entries (reflecting time spent thereafter in getting ready for the actual June 2001 trial). Lenell's counsel sought to portray that as the needless expenditure of nearly another 150% of the original time to "get ready" for a case that had already been trial-ready.

Not so: Cancellation of the first (February) trial date

10

came with 11 days left to go before the anticipated D Day of February 19--time that would have involved the most concentrated activity of what Mayer Brown's Rubenstein described as an expected ten hours per day for each lawyer on a seven-day-work-week basis. When that time, which would have been required (and spent) if the February date had been adhered to (a subject on which this Court finds the testimony of attorney Rubenstein entirely credible), is properly moved from the T2 to the T1 category, it can be seen that no padding or excessiveness was involved. Any modest amount of work that had to be redone to prepare for the June trial was the natural consequence of the Mayer Brown attorneys' having to get the trial engine revved up again (including any necessary refresher work) after the ignition had been turned off in February.

Still another aspect of Lenell's attack that can be perceived only as advanced in bad faith is its counsel's attempt to question and stress the fact that about $150,000 of the $440,000-plus of fees (exclusive of interest) that are sought to be recovered in this proceeding has not yet been paid by Zapata. In that respect Zapata's trial counsel explained that was the result of insufficient cash flow being sustained by Zapata--scarcely surprising in light of the still-continued failure by Lenell to pay even $1 toward its obligations, even though its own records have always shown that it owed Zapata far,

far in excess of a half million dollars. In fact Zapata acknowledges that it is firmly obligated to Mayer Brown for the entire amount billed by the law firm, and Zapata continues to make further payments on account as its cash flow permits. For Lenell to dispute any part of the fees claim because such fees have not yet been paid by Zapata--a factor due entirely to the manner in which Lenell has dishonored its own acknowledged obligations to Zapata--has (as this Court has previously said) exactly the same degree of merit as the plea of the defendant who, having been found guilty of murdering both his parents, asks the court for mercy because he is an orphan.

This opinion has sought to deal in terms only with the highlights (or more accurately the lowlights) of Lenell's attempted onslaught on the Zapata request. Suffice it to say that this Court has examined and has carefully considered every other argument presented by Lenell and has found them all equally wanting (so that any absence of express treatment in this opinion should be viewed as without significance). On the other side of the coin, Zapata's evidentiary presentation has been wholly credible and entirely persuasive.

Accordingly the Zapata motion is granted in its entirety. Its Fee Ex. 6 has calculated compound interest through various dates, and the one applicable to this opinion (projecting one more day for docketing) calls for $43,357.64 in compound interest

in addition to the principal sum of $441,708.69, or a total of $485,066.33. Judgment is therefore ordered to be entered in favor of Zapata and against Lenell in that aggregate sum of $485,066.33.[7]

                                     */s/ Milton I. Shadur*
                                     Milton I. Shadur
                                     Senior United States District Judge

Date: March 13, 2002

---

[7] This opinion has not taken account of the possibility of awarding fees for services rendered by Mayer Brown in this fee proceeding itself, a type of award that our Court of Appeals has approved from time to time despite the prospect described by Jonathan Swift's lines of doggerel:

> So, naturalists observe, a flea
> Hath smaller fleas that on him prey;
> And these have smaller still to bite 'em;
> And so proceed ad infinitum.

In that respect it would of course be possible to avoid Zeno's Paradox (another expression of the same ad infinitum proposition) by estimating the amount of time and therefore the fees attributable to the final increment of fees-on-fees work.

13